J-S73028-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CARLOS CASTILLO | |
| Appellant | No. 892 MDA 2014 |

Appeal from the Judgment of Sentence of April 23, 2014
In the Court of Common Pleas of York County
Criminal Division at No.: CP-67-CR-0004729-2013

BEFORE: BOWES, J., WECHT, J., and MUSMANNO, J.

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 19, 2014**

Carlos Castillo appeals from the judgment of sentence entered on April 23, 2014, following a jury trial and conviction of one count each of resisting arrest, possession with intent to deliver ("PWID"), tampering with evidence, and possession of a controlled substance.[1] We affirm.

On March 6, 2013, state parole agent Gerard Masucci performed a parole check on Castillo in his home at 727 Manor Street, York, Pennsylvania. Agent Masucci asked Castillo to provide a urine sample for a drug test and, noticing that Castillo appeared nervous, asked Castillo if the test would be positive. Castillo said it would, but that he was working to get into rehab. Castillo then consented to a search of his room, during which

---

[1] 18 Pa.C.S.A. § 5104, 35 P.S. § 780-113(a)(30), 18 Pa.C.S.A. § 4910(1), and 35 P.S. § 780-113(a)(16), respectively.

Agent Masucci, who was working alone, proceeded to handcuff Castillo from behind and search him, as is standard practice.

While searching Castillo, Agent Masucci recovered a resealable bag containing what was later determined to be fourteen glassine bags with a total of .32 grams of heroin, and an additional 179 glassine bags containing residue of heroin, packaged in bundles of ten with rubber bands. Agent Masucci called his supervisor and reported the discovery. Castillo then got up and, while still handcuffed behind his back, grabbed the resealable bag and ran for the bathroom where he attempted to flush it down the toilet. Agent Masucci followed Castillo into the bathroom, and the two wrestled there for several minutes until Agent Masucci stunned Castillo with a Taser. This subdued Castillo, who was then taken into custody by York City police who arrived after the scuffle. *See* Notes of Testimony ("N.T.") Trial, 3/4/2014, at 15-28.

Officers recovered the plastic bag from the toilet, which had leaked water into the bag, and found approximately $250 in cash on Castillo's dresser, ten more glassine bags of heroin, and 1.8 grams of cocaine in three corner bags on Castillo's person. *Id.* at 58-60. The officers inventoried the contents of the bag, removed the rubber bands, laid out the glassine bags to dry, and sent them to be analyzed by the Harrisburg Regional Crime Laboratory.

A jury convicted Castillo of the above-mentioned counts on March 5, 2014,[2] and on April 23, 2014, the trial court sentenced Castillo to an aggregate term of not less than four nor more than eight years' incarceration. Castillo did not file post-sentence motions. On May 23, 2014, Castillo timely appealed to this Court, and the trial court ordered him to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). After receiving two extensions of time, on July 15, 2014, Castillo timely filed his Rule 1925(b) statement. The trial court entered an opinion pursuant to Pa.R.A.P. 1925(a) on July 22, 2014, relying upon the sentencing transcript of April 23, 2014.

Castillo raises the following question for our review: "Whether the Commonwealth failed to establish sufficient evidence to convict [Castillo] of Possession with Intent to Deliver (PWID) because the Commonwealth failed to prove beyond a reasonable doubt that [Castillo] intended to distribute the drugs in his possession?" Castillo's Brief at 4. Specifically, he argues that the hypothetical situation upon which the Commonwealth's expert based his opinion "was based on 204 bags of heroin, not 179 bags of residue with the remainder containing heroin in an amount that could easily be for personal use." *Id.* at 11. Thus, Castillo contends that the evidence was insufficient

---

[2]    The jury acquitted Castillo of an additional charge of aggravated assault.

to show that Castillo possessed the drugs for anything more than personal use. *Id.* We disagree.

When reviewing a sufficiency of the evidence claim, our standard of review is as follows:

> We must determine whether, viewing all the evidence at trial, as well as all reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth, the jury could have found that each element of the offense was proven beyond a reasonable doubt. Both direct and circumstantial evidence can be considered equally when assessing the sufficiency of the evidence.

*Commonwealth v. Bull*, 618 A.2d 1019, 1020 (Pa. Super. 1993) (quotation omitted).

> In order to prove the offense of possession with intent to deliver a controlled substance, the Commonwealth must prove beyond a reasonable doubt both that the defendant possessed the controlled substance and had the intent to deliver. When determining whether a defendant had the requisite intent to deliver, relevant factors for consideration are the manner in which the controlled substance was packaged, the behavior of the defendant, the presence of drug paraphernalia, and large sums of cash. Expert opinion testimony is also admissible concerning whether the facts surrounding the possession of controlled substances are consistent with an intent to deliver rather than with an intent to possess it for personal use.

*Commonwealth v. Carpenter*, 955 A.2d 411, 414 (Pa. Super. 2008) (citations and quotation marks omitted). "Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court. We may reverse only if we find an abuse of

discretion or error of law." ***Commonwealth v. Ventura***, 975 A.2d 1128, 1140 (Pa. Super. 2009) (citation omitted).

At trial, Officer Daniel Craven testified that on March 6, 2013, he and his partner, Officer Daniel Lentz, responded to a call to assist Agent Masucci at Castillo's residence. The officers searched Castillo and found crack cocaine in corner bags on his person and $250 in cash on his dresser, and Officer Lentz retrieved the plastic bag from the toilet. Officer Craven observed that water had gotten into the bag, and described its contents as follows:

> They were like blue like wax paper bags, typical what heroin is packaged in. They come in different colors. These happen to be like a light blue color. A bunch of them were rubber banded with a single band, like banded together in bunches, and they were inside this plastic bag.
>
> *     *     *
>
> There was a few bundles separated, and then they were—I can't remember how many bundles there were off the top of my head. There were basically groups bundled up and then there was several groups of them thrown in this plastic bag.
>
> Q.     You've already testified that is how heroin is typically packaged, in your experience?
>
> A.     Yes.
>
> Q.     So, this was divided into several bundles?
>
> A.     That's correct.

N.T., 3/4/2014, at 99-101.

Officer Craven further stated:

The way [the glassine bags] were bundled and packaged and folded, generally, when you come across used bags, I have never seen anyone in the 11 years [of experience] rebundle used bags. Usually they are just laying loose. They are partially torn. They are not folded. They are definitely not folded and nicely and neatly stacked. They are generally in some form of disarray or usually torn to some extent or folded unevenly. I have never seen heroin—empty heroin bags rebundled the same way you bundle full bags.

*Id.* at 103.

Christina M. Fialkowski testified for the Commonwealth as an expert witness in the area of drug identification and forensic science. She identified the Commonwealth's exhibits as the glassine bags recovered from Castillo, which she had tested and identified as heroin. N.T., 3/5/2013, at 77-83.

Additionally, Detective Andrew A. Shaffer, a police officer in the City of York, was admitted as an expert in the area of illegal drug sales and transactions. He confirmed that heroin is typically packaged for sale in bundles of ten, and that it would cost about $2,000 to buy twenty bundles, or 200 bags, of heroin. *Id.* at 100. He testified: "Heroin is water soluble. If it does get wet, it does dissolve, yes, sir." *Id.* He explained:

I've observed heroin in regular form of glassine bags like this go in the water and then basically what's left is maybe just a residue or just a brown, then it gets hard and it'd hardened to the bag [*sic*], but a different color. . . . [T]hen, once it would dry—it would get wet and it would dry, there'd be probably a scaly appearance on the bag.

Q.    Do you see that scaly hardened substance on those 179 bags from the Commonwealth's Exhibit No. 1, I believe? Do you see that?

A.      Without tearing this open, I do see it in some of the bags, yes, but I would have to tear the bags open to look at each individual one.  But I can see that in these bags, yes, sir.

*Id.* at 114-15.

With regard to usage, the Detective testified as follows:

A heroin addict will have empty packets.  Again, someone that's a hard addict—heroin is a drug that a person needs first thing in the morning when they wake up, whether it's 4:00 in the morning or 5:00 in the morning, they need that drug.

If they used the heroin prior or the night before and they have nothing left, most heroin addicts will keep three, four, or five bags from the prior day and try to tear those bags open, lick the corners, sniff the corners.  And again, originally, a bag has only .03 hundredths of a gram of heroin in it, so there might be a tiny, tiny, tiny minute bit that they'll get out of there, but at least it's—they try to do that to help their addiction.

So again, it's very common for them to keep three to five, six to eight empty bags around that they've already used, but hopefully they can just get a tiny, tiny bit out before they start getting ill or sick.

Q.      Is it typical, in your experience, for an addict to have 20 bundles around?

A.      To have 20 full bundles?

Q.      Yes.

A.      That would be someone that has a significant amount of money.  If it's a person that—it's certainly possible if a person plans on using all that heroin.  . . .

To keep that around, you'd have to have—originally, you'd have to have $2,000 to purchase that heroin . . . .

*Id.* at 108-09.

Q.      What's the most of empty bags that you've seen a heroin user have in their presence or kept around their room or—

A.  I mean, it depends.  It could be 3, 6, 8, 10.  I don't recall anywhere where I've been in where there's over 20 empty bags scattered in a room.  . . .

Q.  Have you ever seen a heroin use keep 20 empty bundles rubber banded together?

A.  No, sir.

*Id.* at 116.

The Commonwealth presented Detective Shaffer with the following hypothetical situation:

Q.  Thank you.  Detective, I'm going to present you with a hypothetical situation, and I would like you to tell me in your expert opinion whether you believe the drugs in question would be possessed with intent to deliver or not.

If an individual were to be found with 204 bags of heroin divided into 20 bundles, that individual had $250 in cash in his residence, however, he also indicated that he had no job and gets $600 a month in disability.  In your expert opinion, was that heroin possessed with intent to deliver?

A.  In my expert opinion, the person that possessed it with intent to deliver, yes, sir.

Q.  Okay, and what is your reasoning for that decision?

A.  The reasoning, again, it's such a large quantity of heroin.  It's $2,000 worth of heroin.  In order to purchase that, you need to have $2,000.  A person that would only make $600 a month, that would be over three months of their income, and you've got to take aside that they would have, you know, bills to pay, utilities, food, and that kind of stuff.

Even if they would use that entire $600 a month or save up for three months, it would be three months['] worth of heroin.  It's just that the main thing here is the quantity of heroin associated with somebody that appears not [to] have a whole lot of income.

Q.  Do you hold that opinion to a reasonable degree of professional certainty?

A.    Yes, sir.

*Id.* at 111-12.

Viewing the evidence in the light most favorable to the Commonwealth, the quantity and cost of the drugs, the manner in which they were packaged, and the cash recovered from Castillo, in addition to the expert testimony of Detective Shaffer, which the jury found credible, established intent to deliver beyond a reasonable doubt.  ***See Carpenter***, 955 A.2d at 415; ***Bull***, 618 A.2d at 1021.

Castillo specifically objects to the hypothetical situation presented to Detective Shaffer, arguing that it "was based on 204 bags of heroin, not 179 bags of residue with the remainder containing heroin in an amount that could easily be for personal use."  Castillo's Brief at 11.

"It is, of course, well established that a hypothetical question should contain all material facts.  It is also the law that where an issue is in dispute, counsel propounding the hypothetical may include the disputed fact in the question as testified to by his witnesses."  ***Stack v. Wapner***, 368 A.2d 292, 298 (Pa. Super. 1976) (citing ***Murray v. Siegal***, 195 A.2d 790 (Pa. 1963)).

Here, Officer Craven and Officer Lentz testified that the glassine bags were packaged in bundles in a way that did not suggest they had been used, and that the bundles were soaked when the bag was dropped in the toilet. Furthermore, Detective Shaffer testified that heroin is water soluble and can dissolve into a residue like that observed on the glassine bags once they had

dried out. Thus, the jury could reasonably infer that, before they were soaked, the glassine bags did contain unused heroin packaged for delivery.

Accordingly, Detective Shaffer's expert opinion that Castillo possessed heroin with the intent to deliver, based upon the hypothetical possession of 204 bags of heroin divided into bundles, was not unreasonable in the specific circumstances of this case. *See Stack*, 368 A.2d at 298. Therefore, the trial court did not abuse its discretion in admitting Detective Shaffer's opinion. *See Ventura*, 975 A.2d at 1140. Thus, the Commonwealth presented sufficient direct and circumstantial evidence for the jury to find that Castillo possessed heroin with intent to deliver, and not simply for personal use. *See Carpenter*, 955 A.2d at 415; *Bull*, 618 A.2d at 1021. Castillo's argument that the Commonwealth failed to prove intent to deliver does not merit relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/19/2014